# EXHIBIT A

**COVER SHEET FOR FILING CIVIL ACTIONS**
COMMONWEALTH OF VIRGINIA

Case No. 2021 03802
(CLERK'S OFFICE USE ONLY)

Fairfax County ..................... Circuit Court

PAUL SHAO v./In re: Allstate Insurance Company
PLAINTIFF(S) — DEFENDANT(S)

FILED CIVIL INTAKE
2021 MAR 15 AM 10:56
CLERK, CIRCUIT COURT
FAIRFAX, VA

I, the undersigned [X] plaintiff [ ] defendant [ ] attorney for [ ] plaintiff [ ] defendant hereby notify the Clerk of Court that I am filing the following civil action. (Please indicate by checking box that most closely identifies the claim being asserted or relief sought.)

**GENERAL CIVIL**
**Subsequent Actions**
[ ] Claim Impleading Third Party Defendant
   [ ] Monetary Damages
   [ ] No Monetary Damages
[ ] Counterclaim
   [ ] Monetary Damages
   [ ] No Monetary Damages
[ ] Cross Claim
[ ] Interpleader
[ ] Reinstatement (other than divorce or driving privileges)
[ ] Removal of Case to Federal Court

**Business & Contract**
[ ] Attachment
[ ] Confessed Judgment
[X] Contract Action
[ ] Contract Specific Performance
[ ] Detinue
[ ] Garnishment

**Property**
[ ] Annexation
[ ] Condemnation
[ ] Ejectment
[ ] Encumber/Sell Real Estate
[ ] Enforce Vendor's Lien
[ ] Escheatment
[ ] Establish Boundaries
[ ] Landlord/Tenant
   [ ] Unlawful Detainer
[ ] Mechanics Lien
[ ] Partition
[ ] Quiet Title
[ ] Termination of Mineral Rights

**Tort**
[ ] Asbestos Litigation
[ ] Compromise Settlement
[ ] Intentional Tort
[ ] Medical Malpractice
[ ] Motor Vehicle Tort
[ ] Product Liability
[ ] Wrongful Death
[ ] Other General Tort Liability

**ADMINISTRATIVE LAW**
[ ] Appeal/Judicial Review of Decision of (select one)
   [ ] ABC Board
   [ ] Board of Zoning
   [ ] Compensation Board
   [ ] DMV License Suspension
   [ ] Employee Grievance Decision
   [ ] Employment Commission
   [ ] Local Government
   [ ] Marine Resources Commission
   [ ] School Board
   [ ] Voter Registration
   [ ] Other Administrative Appeal

**DOMESTIC/FAMILY**
[ ] Adoption
   [ ] Adoption – Foreign
[ ] Adult Protection
[ ] Annulment
   [ ] Annulment – Counterclaim/Responsive Pleading
[ ] Child Abuse and Neglect – Unfounded Complaint
[ ] Civil Contempt
[ ] Divorce (select one)
   [ ] Complaint – Contested*
   [ ] Complaint – Uncontested*
   [ ] Counterclaim/Responsive Pleading
   [ ] Reinstatement – Custody/Visitation/Support/Equitable Distribution
[ ] Separate Maintenance
   [ ] Separate Maintenance Counterclaim

**WRITS**
[ ] Certiorari
[ ] Habeas Corpus
[ ] Mandamus
[ ] Prohibition
[ ] Quo Warranto

**PROBATE/WILLS AND TRUSTS**
[ ] Accounting
[ ] Aid and Guidance
[ ] Appointment (select one)
   [ ] Guardian/Conservator
   [ ] Standby Guardian/Conservator
   [ ] Custodian/Successor Custodian (UTMA)
[ ] Trust (select one)
   [ ] Impress/Declare/Create
   [ ] Reformation
[ ] Will (select one)
   [ ] Construe
   [ ] Contested

**MISCELLANEOUS**
[ ] Amend Death Certificate
[ ] Appointment (select one)
   [ ] Church Trustee
   [ ] Conservator of Peace
   [ ] Marriage Celebrant
[ ] Approval of Transfer of Structured Settlement
[ ] Bond Forfeiture Appeal
[ ] Declaratory Judgment
[ ] Declare Death
[ ] Driving Privileges (select one)
   [ ] Reinstatement pursuant to § 46.2-427
   [ ] Restoration – Habitual Offender or 3rd Offense
[ ] Expungement
[ ] Firearms Rights – Restoration
[ ] Forfeiture of Property or Money
[ ] Freedom of Information
[ ] Injunction
[ ] Interdiction
[ ] Interrogatory
[ ] Judgment Lien-Bill to Enforce
[ ] Law Enforcement/Public Official Petition
[ ] Name Change
[ ] Referendum Elections
[ ] Sever Order
[ ] Taxes (select one)
   [ ] Correct Erroneous State/Local
   [ ] Delinquent
[ ] Vehicle Confiscation
[ ] Voting Rights – Restoration
[ ] Other (please specify)

[X] Damages in the amount of $ 70,313.33 are claimed.

3-15-2021
DATE

PAUL SHAO
PRINT NAME

[X] PLAINTIFF  [ ] DEFENDANT  [ ] ATTORNEY FOR  [ ] PLAINTIFF  [ ] DEFENDANT

9233 Lee Masey Dr., Lorton, VA 22079
ADDRESS/TELEPHONE NUMBER OF SIGNATOR

Tel: 202-390-6300

paulyshao@gmail.com
EMAIL ADDRESS OF SIGNATOR (OPTIONAL)

*"Contested" divorce means any of the following matters are in dispute: grounds of divorce, spousal support and maintenance, child custody and/or visitation, child support, property distribution or debt allocation. An "Uncontested" divorce is filed on no fault grounds and none of the above issues are in dispute.

FORM CC-1416 (MASTER) PAGE ONE 07/16

# FAIRFAX CIRCUIT COURT
# CIVIL CASE COVERSHEET

**2021 - 03802**

**Parties:**

| Plaintiffs | Defendants |
|---|---|
| 1. Paul Shao | 1. Allstate Insurance Company |
| 2. | 2. |
| 3. | 3. |

*2021 MAR 15 AM 10:56*

*Plaintiff proceeding without Counsel – Address and Daytime Phone Number required on Complaint

**Plaintiff Attorney:**

| Name: | Bar ID: |
|---|---|
| Firm: | |
| Street: | |
| City: | State: | Zip: |
| Phone Number: | Fax Number: |
| E-mail Address: | |

**Nature of Complaint** (Check only one)       * Cases in the Civil Tracking Program

| | | |
|---|---|---|
| Administrative Appeal | Defamation * | Malpractice – Medical * |
| Affirmation of Marriage | Delinquent Taxes * | Mechanics/Vendors Lien * |
| Aid & Guidance | Eminent Domain | Partition * |
| Appeal Decision of Board of Zoning | Encumber/Sell Real Estate | Personal Injury – Assault * |
| Appeal of Process/Judicial Appeal | Erroneous Assessments | Personal Injury – Auto * |
| Appointment Church/Organization Trustees | Expungement | Personal Injury – Emotional * |
| Arbitration | False Arrest/Imprisonment* | Personal Injury – Premises Liability* |
| Attachment | Fiduciary/Estate Complaint | Property Damage* |
| Complaint – Equity * | Garnishment–Federal–180 days | Products Liability* |
| Complaint – Legal Cause of Action * | Garnishment–Wage–180 days | Quiet Title * |
| Compromise Settlement | Garnishment–Other – 90 days | Real Estate * |
| Condemnation* | Guardian/Conservator Adult | Restoration of Driving Privilege |
| Confession of Judgment | Guardianship/Minor | Vital Record Correction |
| Construction * | Injunction | Writ Habeas Corpus |
| ✓ Contract * | Interpleader | Writ Mandamus |
| Conversion* | Insurance * | Wrongful Death* |
| Court Satisfaction of Judgment | Judicial Review | Wrongful Discharge * |
| Declare Death | Malicious Prosecution * | OTHER: |
| Declaratory Judgment * | Malpractice – Legal * | |

**Damages in the amount of $** 70,313.33 **are claimed.**

**Requested Service:** Sheriff ☐  Private Process Server ☐  DMV ✓  Secretary of Commonwealth ☐  State Corporation Commission ☐  Publication ☐  No Service at this time ☐

CCR D-90 Civil Coversheet (Revised – October 2011)

# COMMONWEALTH OF VIRGINIA

FAIRFAX COUNTY CIRCUIT COURT

| | |
|---|---|
| PAUL SHAO,<br><br>    Plaintiff,<br><br>v.<br><br>ALLSTATE INSURANCE COMPANY,<br><br>  SERVE: CT Corporation System, Registered<br>          Agent<br>          4701 Cox Road, Suite 285<br>          Glen Allen, VA 23060<br>  Defendant. | Civil Action No. 2021 03802 |

## COMPLAINT AND REQUEST FOR TRIAL BY JURY

### PREFATORY ALLEGATIONS

1. Plaintiff Paul Shao ("Shao") is an individual residing in Fairfax County at 9233 Lee Masey Drive, Lorton, Virginia 22079. He owned until recently an Allstate agency in Springfiield, Fairfax County since August 1, 2015. His Allstate agency was terminated by Allstate as of September 1, 20210.

2. Defendant Allstate Insurance Company ("Allstate") is an Illinois corporation with a place of business located at 1745 Loch Haven Drive, Roanoke, Virginia 24019.

3. Allstate is referred to herein as "Allstate".

### Background

4. Allstate is in the business of selling insurance products, along with related services, to consumers throughout the United States, including the Commonwealth of Virginia.

5. Toni Shaner ("Ms. Shaner"), as an Allstate sales leader and recruiter and employee of Allstate, had attempted to recruit Plaintiff in April 2015 so that she could receive a recruiter commission,

emphasizing the Trusted Advisor program as the future of Allstate. Plaintiff had been a 20-year Nationwide Insurance agent from 1991 to 2011 with a proven sales record of building from scratch up to $2.6 million premiums in his first four years with Nationwide Insurance company and of attaining the Chairman Conference in 1994. Shao was given the offer of purchasing a small agency of less than $1.5 million of book value with 50-100 thousand dollars down and a loan of the balance from Allstate. Shao was then 68 years old and had expressed some reservation as to his ability to survive as an agent-owner with Allstate. Ms. Shaner assured Shao that, if he could perform well in the first year, it should be easy-going for him down the road. She further assured Shao that Allstate would buy back the insurance book from him at the multiplier of 1.5 (the function of which will be explained later) in calculation of the value of the book so that Shao would not have lost all he had invested, if his agency were to be terminated.

6. The standard way of calculating the value (thus the price) of an Allstate agency is as follows: total annual premium received x 10% (commission Allstate pays to agent) x a multiplier in the range of 2 to 2.5, which is determined by the retention, the loss ratio and ability to sell life insurance, etc. For example, an agency of $1 million annual premium with mediocre performance may be valued at: $1,000,000 x .1 (commission) x 2 (multiplier) = $200,000. Shao purchased an agency from the former owner, Brent Elliot ("Mr. Elliot") of Washington Associates, Inc., having a book of $1.8 million, a portion of which consisting $1,445,906 (consisting of $1,413,697 personal lines and $32,209 commercial lines) was sold to Shao for the price of $339,767.91 (= $1,445,906 x .1 x 2.35), which was paid with a loan of $250,000 from Allstate and $89,787.91 down payment from Plaintiff. In addition, Allstate also served as the settlement agent for the transaction between Shao and Mr. Elliot on August 4, 2015. Mr. Elliot produced a total of 68 personal lines policies in the 12 months prior to the settlement date of 8-1-2015. This fact eased Shao's mind in the sense that he felt he could have done as Mr. Elliot did, if Shao's old age hindered him from carrying on the business for very long.

7. Four months after joining Allstate, Ms. Shaner and Shao had Christmas dinner at Asian Grill restaurant in West Springfield. She informed Plaintiff that he did well and encouraged him to achieve Honor Ring in the year 2016 to receive a substantial bonus and to enable him to purchase a second agency, just as she said, after reviewing plaintiff's business proposal, in her 6-30-2015 email, which stated "I am glad to hear that you have outlined the activities to exceed Tier I goals each month. Successful implementation will help you grow your business and prepare for your second location." Shao did achieve Honor Ring in 2016 and received over a twenty-thousand-dollar bonus in 2017. However, what lay ahead was not prosperity but nightmare.

8. However, Allstate was planning in 2015-16 to abandon the Trusted Advisor program, which Shao was recruited for in 2015. Allstate employed Glenn Shapiro ("Mr. Shapiro") from Liberty Mutual Insurance to become the executive vice president in April 2016 and subsequently replaced Mathew Winter as the president of Allstate personal lines insurance in March 2018. In January 2019 Mr. Shapiro, who oversaw the entirety of the operations of Allstate personal lines, had implemented in place of the Trusted Advisor program the so-called Transformative Growth program, which meant a sales quota for each agency, mandatory Integrated Services (Allstate taking over the service of agent's book with a 2% of commission charge to agents) for new agent or new location of an existing agent after November 2019. Mr. Shapiro also later that year announced the reduction of renewed commission of personal lines from 10% to 9%, to be realized in January 2020. The impact of Transformative Growth program has been dramatic. The value of Allstate agencies has plummeted 20% due to the reduction of commission from 10% to 9%, and agency-buyer's reluctance to pay 2% of commission, (which would reduce agent commission from 9% to 7%, as 2% goes to Allstate for

servicing policies of an agency), for the Integrated Services of 2% were forced upon new agency-buyer by Allstate.

9. In 2017 Plaintiff had a new supervisor Ann Smith ("Ms. Smith"), who liked to play the role of a recruiter of new agents so that she could receive a commission of up to $10,000 – Allstate had just raised the referral fee commission from $5,000 to $10,000 in 2017. She had suggested since 5-2017 to Shao to sell his agency and formally wrote an email to Shao on 10-6-2017, stating, "Paul, would you consider selling in January if there was a solid buyer ready?" Shao replied the same day, saying firmly, "Ann, I shall stay on with Allstate for at least another two years." It was a clear statement, which expressed Shao's intention to stay with Allstate until at least October 6, 2019 and, yet, on 12/13/ 2018 Ms. Smith pressed the issue of selling his agency by recommending a "highly qualified candidate" of agency-buyer, Maurice Springer ("Mr. Springer"), for Shao to meet. Ms. Smith, Mr. Springer, and Shao met in Shao's office in the afternoon of 1-4-2019. Customarily, a buyer will receive at the first meeting a copy of the business metrics, which details the size of the book, retention, and loss ratio. However, Ms. Smith in the meeting sent to Mr. Springer and his banker Ed Lull all his four years financial statements without receiving a signed letter of intent, a down payment, and a prequalification from Mr. Springer. She also presented the statement of termination payment of Shao's agency and described in the presence of Mr. Springer to Shao in a lurid manner how Allstate could reduce in various ways the payments to the terminated agent to leave him penniless. Mr. Springer acted as though he had already been the owner of Shao's agency and inspected the office in exceptional detail to the point of suggesting changes of the layout of the office. Shao's assistant Maggie Linxia Wang ("Ms. Wang") sensed something was wrong. She felt insecure and resigned from her employment. She left the agency at the end of January 2019.

10. Shao spent 5 months coaching Ms. Wang at the start of his agency in 2015 for her to obtain a Property and Casualty license and took her around his community to get to know his old customers. She was a very capable agent and was able to run his agency starting early-2016. At the end of 2017, Shao was diagnosed with sleep apnea, which meant feeling tired during the daytime, even after a full night of sleep. The loss of Ms. Wang meant that Shao would not be able to grow his agency, since Shao lacked the energy to train another assistant to help Shao run it. At the time (11-2018) Shao's book of premium was $1,530,114, which was $116,417 more than the book of $1,413,697 he purchased in 8-2015. Usually, an agency loses 10% of the premium due to normal drops of policies. Accordingly, ordinarily first year would be reduced to $1,272,327, the second $1,145,094 and the third $1,030,585 with a total reduction of $499,528 in three years. Therefore, Shao had a "growth ($499,528 + $116,417 = $615,945)" of 43.5% (=$615,945/$1,413,697x100; average 14.5% per year) in the three years from 2015 to 2018. This **bad faith** act of bringing Shao a buyer by Ms. Smith resulted in the resignation of Ms. Wang and thus put his agency on the road to decline.

11. In that same month (1-2019) Allstate announced a termination program called "Agency Business Objectives (ABO)," which would start 4-1-2019 and stipulated two points, 1. "Minimum production goals will increase from four to six standard items per month (excludes add items)" and 2. "The threshold for not achieving minimal guidelines will decrease from 10 to eight months". It also mentioned that this ABO program had been launched since 1-1-2013. The fact of the matter is, according to agents and ex-agents in the Facebook platform All Agents Page, which has a membership of 2,500, this program was put in place in 2013 but had never been executed. However, it was meticulously executed this time in 2019 and hundreds of agents had been ABOed since 4-2019. And Shao was one of those being ABOed. Once ABOed, Allstate would, if an agency were terminated, pay the agency owner what is called a Termination Payment (TPP), which it is

contractually obligated to pay, and which would utilize a multiplier, explained above in paragraph 6. For TPP, Allstate would use a much lower multiplier of 1.5 vs. 2.35, the multiplier used when Shao purchased the book.

12. Around 2-20-2020, Ms. Smith delivered to Shao a Termination letter, dated 2-10-20, signed by her supervisor, Ms. Jennifer Frusco ("Ms. Frusco"). She explained to Shao the content of the letter, informing Shao that he would be terminated on 5-30-2020. She showed Shao, on the Allstate computer platform Gateway, the spreadsheet of TPP Summary, which showed the TPP amount he would receive from Allstate after the date of termination. She said she would send a copy of a 5-30-2020 statement. When Shao looked at the spreadsheet, he found one problem: at the time Shao's book was of the size $1,418,679 and, under the new formula, he should have received 1.5 x .09 x $1,418,679 = $191,521 from Allstate. But a premium sum of $414,028 was excluded from $1,418,679 to be used to calculate the payment figure. Thus, only $1,004,651 had been used for the calculation of the TPP payment, which resulted in the payment figure of $135,487. Shao asked Ms. Smith for an explanation but she never provide an answer. He requested a written explanation from her, but she never provided it.

13. On or around 3-23-2020 Shao called Ms. Smith, asking whether the termination could be postponed for two months due to the sudden outbreak of Covid-19, which inspired fear and horror to Shao, who was at the vulnerable age of 73, from all the rumors and news about the disease at that time. She said that, just that morning, words from the central administration at Allstate's Chicago headquarters was that no postponement for termination would be granted. With deep fear and horror in his heart Shao wrote on 5-25-2020 to Allstate CEO, Tom Wilson ("Mr. Wilson"), saying, "The oozing of the milk of human kindness during this crisis of the out bursting of Covid-19 is remarkable [...]. I wonder whether Allstate would extend the deadline day of termination two more months for agents who had received the notice this year." Shao received no reply from Mr. Wilson. However, Ms. Smith told Shao that, if he had a legitimate buyer for his agency, he could have a three-month extension. Shao started talking to friends about the sale of his agency. A friend of his, Catherine Lee ("Ms. Lee"), expressed an interest and submitted on 4-29-2020 a signed letter of intent. She went through an extensive vetting procedure of Allstate by submitting bank account statements, consenting to background check, etc. Shao, terrified by the unknown disease of Covid-19, wrote on 5-4-2020 to Mr. Wilson again, begging for an extension, based on the fact that he had found a legitimate buyer. As a result of this letter, he finally received his extension notice from Ms. Frusco on 5-15-2020 to have a new termination day of 8-31-2020.

14. Ms. Lee, however, did not move ahead with the purchase, because she was unhappy at the way she had been vetted. Another outside buyer, Amy Ho, was also unable to qualify to purchase the agency. Around early July, Shao approached an Allstate agency owner, Ahmed Taha ("Mr. Taha"), whose office was about 3 miles from his office, to see whether he would be interested in acquiring his book of business. He told Shao that he was interested but was not permitted by Allstate to make the acquisition. His supervisor was Ms. Shaner. Shao realized that he was at the end of the road to acquire a buyer for his agency.

15. On 3-19-2020, Shao received an email from Brandon Hokanson ("Mr. Hokanson") of Allstate Finance Company, an affiliate or subsidiary of Allstate, from which he received a loan in the sum of $250,000 with an interest rate of 6.6% and a term of 10 years, starting 8-1-2015, <u>in order to purchase the agency</u>. The monthly payment of the loan is $2,851.44. In his follow-up email on the same day, Mr.

Hokanson stated, "You currently have an estimated shortfall of $20k+ if you elect TPP." He did not enclose any statement with his email. Shao looked up his loan balance in the 3-31-2020 statement, which was $155,476.56 and his TPP payment summary report of 3-2020, which was $135,487.40. The difference between the two was $19,989.16, slightly shy of $20k.

16. On 8-28-2020, Shao wrote to Mr. Hokanson, asking for the final pay-off figure. Mr. Hokanson replied on 8-31-2020, saying, "I can't calculate the exact amount required until TPP has been finalized. [...] Based on the numbers today, an estimated paydown of $30k would provide the necessary buffer to cover the shortfall." He said that Shao would be contacted in September 2020. However, when Shao was not contacted by Mr. Hokanson for the final pay-off figure at the end of October, Shao wrote an email on 10-28-2020 to remind him.

17. Mr. Hokanson responded on 11-4-2020, saying, "Committee is requesting a $25,000 paydown by 11/15." This was contrary to what Shao had on record. As of 9-30-2020, Allstate was saying that Shao's loan balance was $143,332.74 and his TPP payment was $129,973.21. (The two are required to be offset against each other.) The difference was $13,359.53. Shao sent to Allstate Finance a check of $2,851.44 on 10-22-2020 and another check of $10,508.09 on 12-8-2020. Both checks had been cashed by Allstate. The sum of these two checks is $13,359.53, which was the difference between the loan balance and the TPP payment, as calculated by Allstate. And yet Mr. Hokanson wrote back on 12-17-2020 without a PMT schedule, stating, "We need to receive $8,120.88 by 1/10." Shao demanded a PMT schedule and referred the matter to his attorney Jeffrey Vogelman (Mr. Vogelman). Finally, on 1-6-2020, Mr. Hokanson provided a schedule, which showed how he reached this sum of $8,120.88.

18. Shao's 8-2020 Termination Payment (TPP) – Summary Report, received from Ms. Smith, showed that only $960,772.39, specified as Termination Payment Eligible 12 MM Earned Premium, of $1,353,508.91 of the 12 MM Earned Premium (his book value) was calculated for the stated TPP payment. The difference sum of $392,736.52 (=$1,353,508.91-$960,772.39) was excluded or non-eligible for payment per Allstate's calculation. If the formula set forth in paragraph 6 above were applied, the payment sum would be $53,019.43 (= 1.5 x .09 x $392,736.52). (Shao actually paid $92,293.08 [=2.35 x .1 x $392,736.52] for this excluded portion of the book.) If this book were sold to any normal buyer, the excluded sum of $392,736.52 would be included in the calculation of the selling price. Shao had asked his supervisor Ms. Smith the reason for the exclusion, and she did not provide an answer. Shao asked Mr. Hokanson, who in his 1-6-2021 email, replied, "I don't have an answer for why a part of you[r] book being excluded from your TPP. That would need to go to someone in agency compensation." Shao did contact agency compensation in June 2020 and received no answer. In fact, Shao had asked Attorney Mr. Vogelman to contact Allstate counsel David J. Mueller ("Mr. Mueller") for an answer on 11-4-2020. Mr. Mueller wrote on 11-18-2020, "Hi Jeff, I apologize for the delayed response to your inquiry. While I can't give you any opinion about the method your client used to determine the purchase price of the agency, I can advise you that the termination payment report reflects both the eligible earned premium and the earned premium. Only the eligible earned premium is used for the termination payment." He merely reiterated the headings of the TPP report without giving an explanation.

19. Mr. Vogelman wrote to Mr. Mueller again on 1-19-2021, pressing for an answer. This time Mr. Mueller provided the explanation, "Typically, the difference between the two premium amounts is due to business that had been written by a prior Allstate agent who operated using an employee

agent agreement. **Employee agent business is generally always excluded from TPP eligibility** (Bold Pro se litigant's). In this case, it would appear your client considered 'earned premium' in his purchase decision rather than only 'eligible earned premium.'" What Mr. Mueller was evidently saying was that the premium $392,736.52 of the book had been generated by policies written by Allstate employee salespersons; therefore, they are non-eligible earned premiums, while the premiums $960,772.39 of the book had been generated by policies written by Allstate independent contractor salespersons; therefore, they are eligible earned premiums. To an outside buyer, such a distinction did not seem to exist, or could be known. Ms. Shaner, who knew about this distinction, and knew which policies had been employee-agent written and which were not, concealed this knowledge from Shao in order to make the sale. Mr. Mueller pointed out that this eligible criterion was provided in the Supplement for the R3001 Agreement, the contract between Allstate and Shao, and it was the duty of the buyer to exercise the "due diligence and deciding which policies to consider in the purchase of the economic interest and, in general, how to value the economic interest that he purchased." There are several issues involved in Mr. Mueller's assertion.

20. First, the term "eligible earned premium," used by Mr. Mueller, cannot be located in the Supplement for the R3001 Agreement (which is incorporated by the terms of the Agency Agreement) throughout the said document. There is in fact no such term or concept in the contract between Shao and Allstate.

21. Second, the Supplement was intentionally or by design not made known to Shao at the signing of the contract in the summer of 2015. Shao had a three-week training session that summer at the Allstate Regional Center in Chantilly, Virginia. Suddenly, on 6-3-2015, all students (who were to become agents) were given a blank form of the main contract to sign and were told that the entire contract could be found at the computer Gateway platform, which students could not access at that time due to having no access code to the said platform. Yet, Shao together with the other students were required to sign the blank forms at that time.

22. Third, the whole procedure and environment for signing the blank contract form was hurried and conducted with an inducing atmosphere.

23. Fourth, Shao received on 8-5-2015 from Diana Heflin of Allstate's Capital Region-Strategic Deployment an email, which stated, "A copy of the signed agreement is attached for your records." The attachment was a ten-page main contract plus a two-page sample of a Confidentiality and Non-competition Agreement. There was no mention or delivery of the Supplement (456 pages.) and the Independent Contractor Manual (49 pages.), which were an integral part of the contract. Only Allstate Agency Standards (26 pages.), which was also an integral part of the contract, was given to Shao before the 6-3-2015 signing of the agreement, as part of the training materials. It was, among other things, *bad faith* on the part of Allstate choosing not to providing the full agreement upfront, not making available reasonable time for Shao to review the agreement, and not furnishing a signing environment which was free of coercion and inducing influences.

24. Fifth, Shao signed a separate sales contract to buy the book under question from Mr. Elliott, President of Washington Associates, Inc., on 6-5-2015, which was two days after signing the Allstate contract form. Two days were hardly enough to allow Shao to pursue, in Mr. Mueller's words, "due diligence and deciding which policies to consider in the purchase of the economic interest and, in general, how to value the economic interest that he purchased." The whole process was staged by

Allstate to hinder due diligence from Shao, and Allstate was secretive in revealing who, under Allstate's classification of employee agent and independent contractor, wrote each policy in the book Shao was going to purchase. Ms. Shaner was an accomplice of the scheme of keeping this information from Shao.

25. Sixth, as described in the above paragraphs 12, 18 and 19, Ms. Smith (around 2-20-2020), Allstate's Agency Compensation Department (6-2020), Mr. Hokanson (1-16-2021), and Mr. Mueller (11-18-2020) all declined to explain why a portion of the book was excluded from consideration for the TPP payment. There was a concerted effort by them to be evasive on this topic, because they knew that Shao was not informed of this "secret" of Allstate at the time when he purchased the book in question. Finally, with pressure from Mr. Vogelman of a second letter (1-17-2021), Mr. Mueller reluctantly provided an explanation of this topic under question above. This was 1-22-2021, two months and 4 days after his first evasive letter. This lack of candor on the said topic by Ms. Smith, the Compensation Department, Mr. Hokanson, Mr. Mueller, and Ms. Shaner was understandably in line with Allstate's corporate culture of **bad faith**. There is, importantly, no agreement for Allstate to exclude a portion of the book from the TPP payment; this is simply not part of any contract (without even considering the way in which the contract was executed between Shao and Allstate).

26. Allstate had planned to discontinue the Trusted Advisor program in 2015-16; however, it continued promoting this program until the end of 2018 to recruit new agents under this banner. Shao was deceived into believing the program was a long-term business mission of Allstate and made the purchase of an Allstate agency in the summer of 2015. Allstate staged the signing of the contract in such a **bad faith** way to deprive Shao of a proper, non-coercive setting of signing a contract, of a reasonable time to review the contract, and of the availability of the entire content of the contract prior to the signing. Furthermore, Allstate and Ms. Shaner hid the insider information of who had produced or written the initial policy in terms of an employee salesperson or an independent contractor salesperson, the distinction of which would arbitrarily give Allstate an alleged excuse of refusing to pay the TPP payment in full. Moreover, Allstate has excluded a portion of the book from the TPP payment without any contractual basis therefor.

# CAUSES OF ACTION

## FIRST CAUSE OF ACTION
### FAILURE TO PAY FULL TPP AMOUNT
(Against Allstate)

27. Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 26 of this Complaint as though each were separately and specifically set forth herein.

28. Shao paid on 10-22-2020 and 12-8-2020 in two installments the difference amount ($13,359.53) of the balance sum ($143,332.74) of his loan from Allstate and the Allstate-dictated TPP payment amount ($129,973.21) to Shao. In a normal situation, this **good faith** payment should cancel the

loan under question. However, Allstate took the position that the TPP amount should have been paid out in 24 monthly installments, although there is no contractual basis for this; therefore, Allstate claims the loan amount is to be charged an interest rate of 6.6% until the end of the 24 months, at which time Shao will owe a sum of $8,120.88. Allstate had also appropriated Shao's book of $1,418,679 and unilaterally decided that it would only pay $129,973.21 on the portion of the book of $960,772.39, classified by Allstate as Termination Payment Eligible 12 MM Earned Premium, although there is no contractual basis for this either, because this portion of the book was not written by employee salespersons of Allstate. Allstate would not pay a lump sum of $129,973.21 now but would only do 24 installments of $5,415,55 each month. Since Allstate had not paid the full lump sum of the buyout amount of $129,973.21 in its unilateral appropriation of Shao's book, Shao's financial interests in the book remains in force until the final payment was made. Therefore, Shao asks Allstate to pay him the prevailing annual commission of 9% on the sum of $960,772.39. As a result, for a single year, the amount of this commission payment is $8,646.95 and the two-year sum is $17,293.90.

29. Allstate is retaining, and not paying, amounts rightfully belonging to Shao in the amount of at least $70,313.33 (=$17,293.90 + $53,019.43). Allstate is indebted to Shao in at least that amount.

## SECOND CAUSE OF ACTION
### FAILURE TO PAY THE PORTION OF THE BOOK, WRITTEN BY EMPLOYEE SALESPERSONS
(Against Allstate)

30. Plaintiff repeats and re-alleges each and every allegation set forth in paragraph 1 through 29 of this Complaint as though each were separately and specifically set forth herein.

31. Allstate staged the signing of the contract in such a **bad faith** way to deprive Shao of a proper, non-coercive setting of signing a contract, of a reasonable time to review the contract, and of the availability of the content of the contract prior to the signing. Allstate orchestrated an organized and systematic scheme to prevent outside buyers of Allstate agencies including Shao's, to conduct due diligence in finding out the terms of the contract which would permit Allstate to refuse payment of those policies written by Allstate employee salesperson.

32. Whether a policy had been written by an Allstate employee salesperson or not was privileged knowledge, only known to Allstate insiders. Ms. Shaner knew this scheme of Allstate's and knew the book Shao was going to purchase consisted of policies written by Allstate employee salespersons (not disclosed to Shao until Allstate terminated his agency, and for which there is no contractual basis), and knew that, when TPPed, Shao would not receive his full TPP payment. She participated in this **bad faith** scheme of Allstate by keeping her silence.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court grant the following relief:

a. Judgment against Defendant Allstate in the amount of $70,313.33;

b. Pre-judgment interest from September 1, 2020, and post-judgment interest;

c. Any legal fees Shao incurs and costs; and

d. A declaration that Shao now owes no sum of money to Defendant Allstate; and

e. Such other and further relief as this Court deems just and proper against Defendant.

## REQUEST FOR TRIAL BY JURY

Plaintiff hereby requests that this action to be tried by jury, as to all issues and counts herein.

**PAUL SHAO,**

*Pro se* litigant

Paul Shao

9233 Lee Masey Drive,

Lorton, Virginia 22079

(202) 290-6300 Telephone

paulyshao@gmail.com